FILED & JUDGMENT ENTERED
Steven T. Salata

Dec 11 2012

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

|  |  |
|---|---|
| In re: | )<br>) |
| THE MCALPINE GROUP, LLC, | ) Case No. 10-32663<br>) Chapter 7 |
| Debtor. | )<br>) |
| EASTWOOD CONSTRUCTION, LLC, | )<br>)<br>) Adversary No. 11-3026 |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| THE MCALPINE GROUP, LLC and<br>MCALPINE-BARRINGTON OAKS, LLC, | )<br>) |
| Defendants. | )<br>) |
| CHARLES LINDSEY MCALPINE and<br>MCALPINE-BARRINGTON OAKS, LLC, | ) Adversary No. 11-3163<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| PRINCETON PARTNERS, LLC,<br>EASTWOOD CONSTRUCTION LLC, and<br>JOSEPH DORITY, | )<br>)<br>) |

1

Defendants.                    )
_____)

## MEMORANDUM AND RECOMMENDED ORDER PARTIALLY GRANTING MOTIONS FOR SUMMARY JUDGMENT

**THESE MATTERS** are before the Court upon Plaintiff Eastwood Construction, LLC's ("Eastwood") Motion for Summary Judgment in Adversary Nos. 11-3026 and 11-3163, Defendants The McAlpine Group, LLC's ("the McAlpine Group"), McAlpine Barrington Oaks, LLC's ("MBO"), and Charles Lindsey McAlpine's ("Lindsey McAlpine"), (collectively, "McAlpine Parties") Motion for Summary Judgment in Adversary Nos. 11-3026 and 11-3163, and Princeton Partners, LLC's ("Princeton") Motion for Summary Judgment in Adversary No. 11-3163.

A hearing was held on October 22, 2012. Fred W. DeVore, III appeared on behalf of The McAlpine Parties[1], James C. Adams appeared on behalf of Eastwood, David Carmen appeared on behalf of Princeton, and Keith Johnson appeared on behalf of the Trustee for the McAlpine Group.

For the reasons set forth below, the undersigned recommends to the U.S. District Court entry of a final order and judgment as follows:

In Adversary No. 11-3026 (AP #26):

> o **Eastwood's First Claim for Relief (Declaratory Judgment/Fraudulent Foreclosure) -** The McAlpine Parties' Motion for Summary Judgment should be

---

[1] Technically, as a Chapter 7 Debtor, the McAlpine Group's legal interests are represented by the Trustee, R. Keith Johnson whereas the other McAlpine parties are represented by Fred DeVore. Some of the pleadings filed in these cases would suggest otherwise. For present purposes, the interests of these parties are sufficiently congruent that we may treat them together, unless otherwise noted.

GRANTED.

o **Eastwood's Second Claim for Relief (Breach of Contract) -** Eastwood's Motion for Summary Judgment against the McAlpine Group should be GRANTED and the McAlpine Parties' Cross Motion for Summary Judgment DENIED**.**

o **Eastwood's Third Claim for Relief (Unjust Enrichment) -** Eastwood's Motion for Summary Judgment against MBO should be GRANTED and the McAlpine Parties' Cross Motion for Summary Judgment DENIED.

o **Eastwood's Fourth Claim of Relief (Equitable Lien) -** Eastwood's Motion for Summary Judgment should be PARTIALLY GRANTED and the McAlpine Parties' Motion for Summary Judgment PARTIALLY DENIED.

o **The McAlpine Parties' First Counterclaim (Tortious Interference with Contract) -** Eastwood's Motion for Summary Judgment should be GRANTED and the McAlpine Parties' Motion for Summary Judgment DENIED.


In Adversary No. 11-3163 (AP #63):

o **The McAlpine Parties' First Claim for Relief (Negligence)** - Princeton's Motion for Summary Judgment should be GRANTED.

o **The McAlpine Parties' Second Claim for Relief (Breach of Contract) -** Princeton's Motion for Summary Judgment should be GRANTED.

o **The McAlpine Parties' Third Claim for Relief (Tortious Interference with Contract) -** Princeton's and Eastwood's Motions for Summary Judgment should be GRANTED and the McAlpine Parties' Cross Motion for Summary Judgment DENIED.

- o **The McAlpine Parties' Fourth Claim for Relief (Civil Conspiracy) -** Eastwood's and Princeton's Motions for Summary Judgment should be GRANTED and the McAlpine Parties' Cross Motion for Summary Judgment DENIED.

- o **The McAlpine Parties' Fifth Claim for Relief (Unfair and Deceptive Trade Practices) -** Eastwood's and Princeton's Motions for Summary Judgment should be GRANTED.

- o **Princeton's First Counterclaim (Promissory Note) -** Princeton's Motion for Summary Judgment should be GRANTED and the McAlpine Parties' Motion for Summary Judgment PARTIALLY GRANTED.

- o **Princeton's Second Counterclaim (Guaranty) -** Princeton's Motion for Summary Judgment should be PARTIALLY GRANTED and the McAlpine Parties' Motion for Summary Judgment PARTIALLY GRANTED.

## FACTS

These actions arise out of a lot purchase agreement for a prospective residential subdivision known as Barrington Oaks, located in Guilford County, North Carolina. (the "Property").  On October 19, 2007, Eastwood and the McAlpine Group entered into the Eastwood Contract, pursuant to which the McAlpine Group was to develop the Property and then sell completed lots to Eastwood based on a contractually required schedule.  Eastwood paid the McAlpine Group a cash deposit totaling $325,000.  However, the McAlpine Group then gave Eastwood's deposit to a newly formed related entity, MBO.  MBO used the funds to purchase the Barrington Oaks Property, taking title in its own name, and not that of the McAlpine Group. To obtain additional funds to purchase the Barrington Oaks property, MBO borrowed money from

Carolina Bank secured by a Deed of Trust dated January 11, 2008.

The Eastwood Contract provided that the McAlpine Group must complete twenty specification ready lots on or before September 15, 2008, unless excused by force majeure. Eastwood Contract 1.C, Ex. 2, AP #3026, ECF No. 56.   Failure of the McAlpine Group to deliver the lots entitled Eastwood to declare the contract in default and recover the $325,000 deposit. Eastwood Contract 1.L., *Id.*   The McAlpine Group did not complete the required lots by the deadline.   After negotiations failed, Eastwood terminated the contract, demanded a return of the deposit, and filed the lawsuit that is now Adv. No. 11-3026.   On August 5, 2009, Eastwood filed a notice of lis pendens on the Property.

MBO's loan from Carolina Bank, evidenced by the Note and Deed of Trust on the Barrington Oaks Property, was assigned to Princeton effective September 30, 2009.   This was not a random purchase.   Princeton and the McAlpine Parties had prearranged a transaction and entered into a contract, (the "Princeton Contract") on October 6, 2009 whereby Princeton would purchase the Loan and Deed of Trust from Carolina Bank, foreclose the Deed of Trust, and take title to the Property free and clear of all of the liens on the Property.   Princeton Contract**,** Ex. E, AP #3163, ECF 51-5.   Such liens included the construction liens arising from improvement of the Property and Eastwood's equitable lien claim/lis pendens.   Pursuant to the Princeton Contract, Princeton foreclosed, bid the debt, and took title to the property on December 23, 2009.

Under the Princeton Contract, McAlpine or one of his companies (which includes the Debtor) would obtain a share of the sale price, a management fee, and potential ownership of individual lots in exchange for managing and marketing the Property.   Princeton had the option of terminating the Contract if "less than ten lots are sold during any consecutive nine month period."   Princeton Contract ¶ 9, Ex. E, AP #3163, ECF 51-5.

The Princeton Contract also addressed the personal guaranty that Lindsey McAlpine had given on the loan with Carolina Bank and which had also been assigned to Princeton. As partial consideration for Lindsey McAlpine's agreeing to market the lots within the Barrington Oaks Property, Princeton also agreed to limit his personal liability under the Guaranty to $25,000. *Id.* at ¶ 2.

Due to its acquired ownership of the Property, on April 27, 2010, Princeton was added as a defendant by Eastwood in the action against the McAlpine Parties, Adv. No 11-3026. Princeton responded with a motion to dismiss the claim lodged against it. While both motions were granted, prior to the entry of the order, on June 18, 2010, Eastwood filed a second notice of lis pendens in which it sought to cure the procedural deficiencies attendant to its first lis pendens notice.

At the time Princeton and the McAlpine Parties entered into the Princeton Contract, MBO entered into a contract with D.R. Horton for the sale of lots in the Barrington Oaks Property. The Horton Contract was expressly contingent on the outcome of the litigation among Eastwood, the McAlpine Group, and MBO—the lawsuit that is now Adversary No. 11-3026. D.R. Horton eventually decided it did not want to purchase the Property and the McAlpine Parties were unable to find another buyer. Princeton terminated the Princeton Contract upon the expiration of the first nine-month period. Ultimately, in December of 2010, Eastwood entered into a contract with Princeton to purchase the Property.

## PROCEDURAL HISOTRY

These adversary proceedings originated as two state court actions and relate to the same residential subdivision, the Property.  The procedural history is tortuously complicated and only the relevant details are provided below.

Eastwood instituted Adversary No. 11-3026 in N.C. Superior Court on May 5, 2009 in an effort to recover $325,000 from the McAlpine Group for breach of the Eastwood Contract. Compl., ¶ 35-42, AP #3026, ECF No. 1.  Eastwood also sued MBO on a theory of unjust enrichment, and sought to impose an equitable lien on the real property that is the subject of the dispute. *Id.* ¶ 43-54.  In March 2010, Eastwood amended its complaint to add Princeton because Princeton had acquired the Property and was therefore a necessary party to the equitable lien claim.

On September 9, 2010, the McAlpine Group was put into an involuntary Chapter 7 bankruptcy by Eastwood.

On Nov. 3, 2010, in state court, the McAlpine Group and MBO counterclaimed against Eastwood alleging tortious interference with the Princeton Contract and a further contract MBO entered into with D.R. Horton (the "Horton Contract").  AP #3026, ECF No. 4-9.  On January 25, 2011, Eastwood voluntarily dismissed its claim against Princeton without prejudice.  AP #3026, ECF No. 4-12.  On February 4, 2011, Eastwood removed Adversary No. 11-3026 to this Court.  ECF No. 1.  On March 20, 2011, Eastwood filed a proof of claim in the McAlpine Group's bankruptcy case.

Adversary No. 11-3163 was commenced on August 2, 2010 in N.C. Superior Court when the McAlpine Group and MBO sued Princeton for breach of the Princeton Contract and for negligence in the performance of the Contract. Compl., AP #3163, ECF No. 3-3.  Princeton filed

two counterclaims, one seeking recovery on MBO's promissory note to Carolina Bank and another seeking recovery on Lindsey McAlpine's Guaranty of this obligation.  On June 9, 2011 and after this Court denied their Motion to Abstain from Adversary No. 11-3026, McAlpine and MBO amended their complaint in state court to join Eastwood, asserting claims of tortious interference and conspiracy.  AP #3163, ECF No. 7-6.  On August 3, 2011 Eastwood removed Adversary No. 11-3163 to this Court.  AP #3163, ECF No. 1.

These two adversary proceedings were consolidated for discovery and a hearing on March 16, 2012.  AP #3163, ECF No. 37.  While the two actions were pending in state court, the parties exchanged written discovery and two depositions were taken. More depositions and further discovery were exchanged in this court.

## LEGAL STANDARD

Summary judgment is appropriate under Rule 7056 of the Federal Rules of Bankruptcy Procedure and Rule 56 of the Federal Rules Civil Procedure when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A party is entitled to summary judgment when the evidence, viewed in the light most favorable to the party against whom summary judgment is sought, could not lead a rational fact finder to find for the non-moving party, and the opposing party does not produce sufficient evidence to demonstrate a genuine, dispositive issue exists for trial. *Id.* at 322-24.

## DISCUSSION

### I.   Jurisdiction and the Impact of *Stern v. Marshall.*

Bankruptcy jurisdiction exists in this judicial district under 28 U.S.C. §1334 over all matters arising in or arising under Title 11 of the United State Code.  The U.S. District Court also has broad jurisdiction over matters that are "related to" a case brought under Title 11.

Under the statutory bankruptcy laws, this Bankruptcy Court is approved to exercise this subject matter jurisdiction in two fundamental ways.  First, it can enter a final judgment as to core matters under 28 U.S.C. §1334 and 28 U.S.C. §157(b)(2)(C).  Second, it may decide related to matters by either consent, or by making recommended proposed findings of fact and conclusions of law, subject to *de novo* review by the U.S. District Court.

However, in *Stern v Marshall,* the Supreme Court called into question the Bankruptcy Court's authority to enter into final judgments in certain core proceedings.  131 S.Ct. 2594 (2011).  While a bankruptcy judge has the statutory authority to enter a final judgment on a debtor's counterclaim against a creditor who has filed a claim against the estate pursuant to the plain language of 28 U.S.C. §157(b)(2)(C), in *Stern*, the Supreme Court held that is unconstitutional for a bankruptcy judge to enter a final judgment on a debtor's state law counterclaim that is not necessarily resolved in the process of ruling on a creditor's proof of claim.  *Id.* at 2620.

Thus, in the aftermath of *Stern*, bankruptcy courts must now evaluate whether or not they have the authority to enter into final judgments on state law counterclaims brought as part of a bankruptcy proceeding.

These present adversary proceedings involve a blend of statutory core matters, non-core "related-to" matters, and potentially *Stern*-type core matters in which this Court is unable to

enter a final judgment.  Further, to the extent of the McAlpine Group's counterclaims against its creditors, this Court's ability to enter a final judgment is in dispute after *Stern*.  Further, not all parties have consented to this Court entering a final judgment on any related-to or *Stern*-type core matters.  This amalgamation presents a bit of a procedural mess.  Were this bankruptcy court to enter a final judgment on some of the claims and address others by recommended order, it would put the U.S. District Court in the unenviable position of serving as trial judge on some claims and appellate court on others, all in the same litigation.  Out of judicial economy and to avoid needless complexity, this Court ops to employ the lowest common denominator and shall make this a recommended order to the U.S. District Court of all of the claims presented. Thus, the following dispositions are recommended:

## II. In Adversary Proceeding 11-3026, Eastwood's Motion for Summary Judgment should be partially granted and the McAlpine Parties' Motion for Summary Judgment partially granted.

### A. Eastwood's First Claim of Relief: Declaratory Judgment/Fraudulent Foreclosure. The McAlpine Parties' Motion for Summary Judgment should be granted.

The McAlpine Parties are entitled to summary judgment on Eastwood's Declaratory Judgment/Fraudulent foreclosure claim.  Eastwood has made no showing that a cause of action for fraudulent foreclosure exists under North Carolina law, much less has it put forth any evidence to support it.  Further, there is no specific evidence to support even the traditional elements of a fraud claim.  It is undisputed that the mortgage debt was owed to Carolina Bank, that the Bank held a valid Note and Deed of Trust on the Property, that Princeton paid real money to acquire the Note, and that the Note was in default.  Therefore, the McAlpine Parties are entitled to summary judgment and the claim should be dismissed.

**B.  Eastwood's Second Claim of Relief: Breach of Contract. Eastwood's Motion for Summary Judgment should be granted and the McAlpine Parties' Cross Motion for Summary Judgment denied.**

Eastwood is entitled to summary judgment on its breach of contract claim against the McAlpine Group.  Summary judgment on a breach of contract claim is appropriate "where an agreement is clear and ambiguous and no genuine issue of material fact exists."  *Epes v. B.E. Waterhouse, LLC*, 728 S.E.2d 390, 393 (N.C. Ct. App. 2012).  To prove its breach of contract claim, Eastwood must show "(1) the existence of a valid contract and (2) a breach of the terms of that contract." *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000).

There is no question that a valid contract existed.  Under the terms of the Eastwood Contract, the McAlpine Group was required to complete twenty specification-ready lots on or before September 15, 2008.  Eastwood Contract 1.L., AP #3026, ECF No. 2-4.  Failure of the McAlpine Group to deliver the lots entitled Eastwood to declare the Contract in default and recover the $325,000 Deposit. *Id.* This language is clear and unambiguous.

The McAlpine Group failed to complete the required twenty lots by September 15, 2008 pursuant to the contract.  McAlpine Dep. 80:24-81:18, July 2, 2012, AP #3163, ECF 51-1.  This is a clear breach of the contract, which entitled Eastwood to terminate the contract and demand return of the deposit.  *Id.* at 107:1-108:14.  When the McAlpine Group failed to return the deposit, Eastwood initiated this lawsuit.

**1.  The McAlpine Group does not have a valid defense.**

In response to Eastwood's breach of contract claim, the McAlpine Group raised the affirmative defenses of 1) anticipatory repudiation, 2) force majeure, and 3) contention that the McAlpine Group was never the intended contracting party to the Eastwood Contract. McAlpine's Ans. 3-5, AP #3026, ECF No. 2-8.  The McAlpine Group, however, failed to

designate specific facts raising a genuine issue of material fact as to any of these affirmative defenses.

### a. The McAlpine Group's anticipatory repudiation defense should fail.

To assert a valid defense of anticipatory repudiation, the repudiation must be of the "whole contract or of a covenant going to the whole consideration, and must be distinct, unequivocal, and absolute[.]" *Profile Invs. No. 25, LLC v. Ammons East Corp.,* 700 S.E.2d 232, 235 (N.C. Ct. App. 2010) (internal citation omitted). Furthermore, even a "distinct, unequivocal, and absolute" "refusal to perform" is not a breach "unless it is treated as such by the adverse party." *Id.* Upon repudiation, the nonrepudiating party "may at once treat it as a breach of the entire contract and bring his action accordingly." *Id.*

Here, it is undisputed that Eastwood first sent a formal termination letter to the McAlpine Group in October 2008—after the McAlpine Group failed to deliver the lots in September 2008 as required under the Eastwood Contract. McAlpine Dep. 107:1-108:14; McAlpine Dep. Ex. 16, AP #3163, ECF 51-7. McAlpine alleges that Joseph Stewart, Eastwood's president, told him that Eastwood did not intend to purchase the lots because the McAlpine Group was in default. *Id.* at 112:9-113:8; Dority Dep. 30:12-20, June 27, 2012, AP #3163, ECF No. 51-4. Stating "I don't intend to perform because you are not going to perform" is not a "distinct, unequivocal, and absolute" repudiation. Even if it was, the McAlpine Group did not then repudiate the Eastwood Contract. Instead, Lindsey McAlpine testified as follows:

> Q. Did you tell them that you believe Eastwood was in default or that they had repudiated the contract or done something that gave you the contract rights?
>
> A. No. I mean we were at that point trying to be very friendly. . . . [W]e just decided let's try not to argue over it and maybe this whole thing will get solved.

McAlpine Dep. 111:13-22.

Then on August 28, 2008, McAlpine and various Eastwood representatives met to discuss a potential workout of the Eastwood Contract.  McAlpine Dep. 93:12-19; McAlpine Dep. Ex. 3, AP #3163, ECF Doc. 51-5.  Again, McAlpine did not claim that Eastwood was in default or make any effort to terminate the contract.  McAlpine Dep. 111:8-13.  Instead, McAlpine and Eastwood worked to renegotiate the Eastwood Contract.  *Id.*  When those negotiations failed, Eastwood terminated the contract because the McAlpine Group failed to deliver the lots as called for under the contract's terms.

In short, Lindsey McAlpine's own testimony shows that there was never "a distinct, unequivocal, and absolute refusal to perform" by Eastwood, nor did McAlpine respond as if there was such a refusal.  The parties both continued to work together until Eastwood terminated the contract for non-performance after the McAlpine Group missed the contractual due date.

### b.  The McAlpine Group's force majeure defense should fail.

When seeking to have performance excused by force majeure, "the burden of proof is on the party seeking to have its performance excused."  *See Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.,* 782 F.2d 314, 319 (2d Cir. N.Y. 1985); *Aquila, Inc. v. C.W. Mining*, 545 F.3d 1258, 1264 (10th Cir. 2008).

According to the force majeure portion of the Eastwood Contract, the McAlpine Group "shall not be liable . . . for any day of delay that is the result of governmental orders, moratorium, insurrection, war, acts of God, excessive moisture, labor strikes or any other cause not within the control of" the McAlpine Group.  Eastwood Contract ¶ 32, AP #3026, ECF No. 2-4.

Lindsey McAlpine testified in his deposition that the McAlpine Group's entire failure to perform under the Eastwood Contract should be excused for force majeure. McAlpine Dep.

13

116:1-9.   However, at the time Eastwood declared a breach of contract and terminated the

Eastwood Contract, the McAlpine Group never protested or claimed that it had a certain number

of extra days to perform.   It is only now, years after the fact that the McAlpine Group seeks to

claim force majeure. Further, the McAlpine Group failed to bring forth any specific facts tending

to show even basic information as to its force majeure defense.   Despite repeated questions by

Eastwood in discovery regarding the number of force majeure days, the McAlpine Group failed

to identify a single force majeure day with specificity.   Instead, Lindsey McAlpine merely

opined, "I am generally familiar with the delays that happened on this project, and I believe that

they all are covered by the force majeure clause." *Id.* at 117:23-25.   McAlpine's self-serving,

conclusory statement is not sufficient to withstand summary judgment.

While the McAlpine Group also relies on the affidavit of Gary Hill, Hill also fails set

forth any specific facts upon which he bases his opinion.   Hill Aff., AP #3026, ECF No. 69-6.

Like Lindsey McAlpine's conclusory opinion, Hill's opinion is, at best, speculation and

conjecture that does not defeat a motion for summary judgment.   *Coleman v. United States*, 369

Fed. Appx. 459, 461 (4th Cir. 2010) (a party "may not rely on beliefs, conjecture, speculation, or

conclusory allegations to defeat a motion for summary judgment").   Therefore, this defense

should fail.

### c. The McAlpine Group, not MBO, was the intended party to the Eastwood Contract.

The McAlpine Group also claims that it was added as a party to the Eastwood Contract

by error and that MBO was the intended contracting party.   McAlpine's Answer. 4, AP #3026,

ECF No. 2-8.   The scant evidence the McAlpine Group brought forth on this issue, however, is

not sufficient to raise a genuine issue of material fact and is barred by the parol evidence rule.

No competent evidence supports the claimed scrivener's error.   In the first place, MBO

didn't exist on the contract date. The Eastwood Contract is dated October 19, 2007. Eastwood Contract, AP #3026, ECF No. 2-4.  The Articles of Organization for MBO were not filed until December 27, 2007.  McAlpine Dep. 74:2-9; McAlpine Dep. Ex. 13, AP #3163, ECF No. 51-7. "McAlpine Group, LLC" is handwritten on the Contract as one of the contracting parties, and this is the obvious intent of the signatories, which included Rice, who worked in a management capacity for the McAlpine Group.  Eastwood Contract 1, AP #3026, ECF No. 2-4.  Moreover, no one ever notified Eastwood about any alleged scrivener's error until after litigation had commenced. *Id.* at 71:8-20.

There is nothing vague or ambiguous about the Eastwood Contract.  It is a contract between Eastwood and the McAlpine Group.  McAlpine's oral deposition testimony to the contrary is barred by the parol evidence rule and does not raise a genuine issue of material fact on Eastwood's breach of contract claim.  *See Thompson v. First Citizens Bank & Trust Co.,* 567 S.E.2d 184, 189 (N.C. Ct. App. 2002) (the parol evidence rule bars evidence of a unilateral mistake introduced to contradict the terms of a contract).

Eastwood made a prima facie case of breach of contract. The McAlpine Group has not brought forth any material facts in rebuttal that would warrant a trial.  Therefore, Eastwood is entitled to summary judgment on its breach of contract claim against the McAlpine Group in the amount of $325,000. Because the McAlpine Group is in bankruptcy, Eastwood will have an allowed claim in the bankruptcy case.

**C. Eastwood's Third Claim for Relief: Unjust Enrichment - Eastwood's Motion for Summary Judgment against MBO should be granted and the McAlpine Parties' Cross Motion for Summary Judgment denied.**

Eastwood is entitled to summary judgment against MBO on its unjust enrichment claim. It is well settled under North Carolina law that "a person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Embree Constr. Group, Inc. v. Rafcor, Inc.*, 411 S.E. 2d 916, 923 (N.C. 1992).   Due to the McAlpine Group's largess, MBO was the recipient of Eastwood's deposit, but MBO provided nothing to Eastwood in return.

Eastwood, however, is only entitled to one recovery arising out of the Barrington Oaks project. Therefore, MBO should be jointly and severally liable with the McAlpine Group in the amount of $325,000.

**D. Eastwood's Fourth Claim of Relief: Equitable Lien - Eastwood's Motion for Summary Judgment Should be partially granted and MBO's Motion for Summary Judgment partially denied.**

An equitable lien arises from "a declaration of a court of equity out of the general considerations of right and justice, as applied to the relations of the parties and the circumstances of their dealings." *Garrison v. Vermont Mills,* 69 S.E. 743*,* 744-45 (N.C. 1910).   In *In re Stafford*, the U.S. District Court for the Western District of North Carolina held that the "imposition of an equitable trust is warranted to prevent unjust enrichment." No 5:06CV145-V (W.D.N.C. Sept. 15, 2011).   The District Court makes clear that equitable lien theories and unjust enrichment theories fall together.

In this situation, MBO used Eastwood's deposit without authority to purchase the land subject to the equitable lien. Because MBO was the ultimate recipient of the Eastwood deposit, used it to acquire the Property, and provided nothing to Eastwood in return, Eastwood is entitled

to an equitable lien against MBO to prevent unjust enrichment. While it is true that the Eastwood Contract precludes an equitable remedy against the McAlpine Group, it is not true against MBO. MBO was not a party to that agreement.

However, although Eastwood's equitable lien claim is valid, Princeton's foreclosure on the Property serves to cut off that equitable lien. Under North Carolina General Statutes §47–18 and §47–20 ("Recording Acts"), priority among competing interests in real property arising from contracts to convey or deeds of trust is determined according to the order in which those instruments are recorded. *See* N.C. GEN.STAT. § 47–18 (providing that no contract to convey real property "shall be valid to pass any property interest as against lien creditors ... but from the time of registration thereof in the county where the land lies..."); *Id.* at §47–20 (concerning recordation and priority of deeds of trust); *In re 222 S. Caldwell St,* 409 B.R. 770, 773 (Bankr. W.D.N.C. 2009). This method of determining priority, which has been described as "pure-race," means that priority is determined according to who wins "the race to the courthouse." It is a method that has prevailed in North Carolina for well over a century. *In re 222 S. Caldwell St.,* at 773.

Here, the Property claimed by Princeton and Eastwood is subject to the Recording Acts. Princeton's interest in the Property is based on Carolina First's duly recorded Note and Deed of Trust, filed Dec. 27, 2007. Eastwood's interest is based on the first notice of lis pendens, filed on August 5, 2009. We are unaware of a court in a pure race statute state that has ever held an equitable lien primes a bank's recorded security interest in a situation akin to the present matter. *Id.* at 795. Eastwood's equitable lien is subordinate in priority to Princeton's Deed of Trust.

Since Princeton foreclosed on the Note/Deed of Trust on December 23, 2009, under N.C. law, any junior liens were extinguished. *See Pete Wall Plumbing v. Sandra Anderson Builders,*

721 S.E. 2d 663, 670 (2011) ("Long settled case law holds, [the] sale [under a mortgage or deed of trust] … cuts out and extinguishes all liens, encumbrances and junior mortgages executed subsequent to the mortgage containing the power.").

Here Eastwood's equitable lien would necessarily be junior in priority to the original, prior recorded, Note/Deed of Trust, which Princeton foreclosed. Thus, that equitable lien was extinguished by foreclosure.

### E. The McAlpine Parties' First Counterclaim: Tortious Interference with Contract- Eastwood's Motion for Summary Judgment should be granted and the McAlpine Parties' Motion for Summary Judgment denied.

Eastwood is entitled to summary judgment on the McAlpine Parties' counterclaim of tortious interference with contract. In order to prevail on a claim for tortious interference with contract, a party must show: (1) a valid contract; (2) knowledge of the contract; (3) the intentional inducement of a third person not to perform the contract; (4) without justification; (5) resulting in actual damage. *See United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 387 (N.C. 1988). While interpreting these elements, North Carolina courts are mindful of the "strong social interest in protecting the freedom of action of the actor." *Peoples Sec. Life Ins. Co. v. Hooks*, 367 S.E.2d 647, 650 (N.C. 1988). Because of this strong social interest, a cause of action for tortious interference seldom lies unless the actor's "only motive is a malicious wish to injure another." *Id.*; *see also Robinson, Bradshaw & Hinson, P.A. v. Smith*, 498 S.E.2d 841, 851 (N.C. Ct. App. 1998) ("Bad motive is the gist of the tortious interference action."). Stated in other words, if one acts with a "legitimate business purpose, his actions are privileged." *Id.*

As will be discussed below, the McAlpine Parties' claim against Eastwood should fail as a matter of law because Princeton did not breach the Princeton Contract, Horton did not breach the Horton Contract, and Eastwood acted with justification.

## 1.  There was no breach of contract.

As a threshold matter, the McAlpine Parties must bring forth evidence sufficient to create a trial question as to whether Eastwood induced some third-party not to perform a contract.  The McAlpine Parties allege that Eastwood interfered with the Horton Contract and the Princeton Contract.

The Horton Contract was explicitly contingent on the resolution of AP 11-3026. Horton Contract  ¶ 37, AP #3163, ECF No 51-8.  In fact, in an e-mail dated February 11, 2010, D.R. Horton told McAlpine, "The final verdict from our legal group at regional and corporate is: We will not move forward as long as the property is clouded with this action. They will not place DRHI in the position of defending a suit." ECF No. 51-7. Eastwood did not intentionally induce D.R. Horton not to perform the Horton Contract because D.R. Horton never had any obligation to perform during the pendency of Adversary No. 11-3026.  As D.R. Horton did not breach the Horton Contract, Eastwood cannot be held liable for tortious interference with that contract.

With respect to the Princeton Contract, Princeton's obligations to make payments to the McAlpine Parties or reduce the debt owed under the note were contingent on the McAlpine Parties successfully facilitating the sale of lots.  The McAlpine Parties failed to sell the lots within the time frames set forth in the Princeton Contract.  McAlpine Dep. 182:1-16, AP #3163, ECF No. 51.  Eastwood cannot be held liable for tortious interference with respect to a contract that Princeton did not breach.

## 2.  Eastwood's conduct was justified.

The McAlpine Parties base their tortious interference claims on (1) Eastwood's request in Adversary No. 11-3026 for an equitable lien on the Barrington Oaks Property and the corresponding lis pendens and (2) the fact that Eastwood discussed lot sales with Princeton while

Princeton was under contract with the McAlpine Parties.  McAlpine Dep. 156:1-25, AP #3163, ECF No. 51.

As to the lis pendens and equitable lien claim, subject to the provisions of Rule 11, "the filing of a civil suit to establish a claim, whether the claim be ultimately determined to be well founded or not" is not wrongful or illegal.  *Austin v. Wilder*, 215 S.E.2d 794, 797 (N.C. Ct. App. 1975).  Eastwood's action may not form the basis of a tortious interference claim.

As to the McAlpine Parties' claim that Eastwood's discussions with Princeton somehow rose to the level of tortious interference, *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, is instructive.  659 S.E.2d 442 (N.C. Ct. App. 2008).  There, a prospective purchaser signed a contract with a landowner to purchase property for future development and resale to a third party.  *Id.* at 446.  After extending the closing date several times, the prospective purchaser had been unable to close and the landowner was unwilling to grant any further extensions.  *Id.* at 446-47. When thereafter, the landowner sold the property to the same third party, allegedly using proprietary information learned from the original purchaser, the original purchaser sued the third party.  *Id.*  The North Carolina Court of Appeals affirmed the trial court's dismissal of the original purchaser's tortious interference claim against the successful third-party purchaser. The Court stated:

> It appears plaintiff and [defendants] were developers and both wanted to purchase the property for development.  We conclude plaintiff and [defendants] were competitors and as such, [defendants] actions were justified.  Because [defendants'] actions were justified, plaintiff fails to allege the requisite elements necessary to state a claim for relief regarding plaintiff's two tortious interference with contract claims.

*Id.* at 452.

The facts of the present case are quite similar.  The McAlpine Parties and Eastwood are

property developers who both wanted to develop the Property for profit.   Under *S.N.R.*, Eastwood's conduct in discussing a potential purchase with Princeton is not actionable.   Thus, the tortious interference claim against Eastwood should fail as a matter of law.

**II. In Adversary No. 11-3163, Princeton's Motion for Summary Judgment should be partially granted, Eastwood's Motion for Summary Judgment should be partially granted, and The McAlpine Parties' Motion for Summary Judgment should be partially granted.**

**A. The McAlpine Parties' First Claim for Relief (Negligence) - Princeton's Motion Summary Judgment should be granted.**

Princeton is entitled to summary judgment on the McAlpine Parties' negligence claim. Under North Carolina law, there is no cause of action for negligent performance of a contract. *Berkeley Fed. Sav. and Loan Assoc. v. Terra Del Sol*, 433 S.E.2d 449, 457-58 (N.C. Ct. App. 1993). "A negligence claim is precluded when the parties' duties to one another are a matter of contract." *McManus v. GMRI, Inc.* 2012 WL 2577420, at *4 (W.D.N.C. 2012) (*citing Strum v. Exxon, Co., U.S.A.*, 15 F.3d 327, 332–33 (4th Cir. 1994). The only exception to this rule is where an independent tort arises in "carefully 'circumscribed circumstances,'" meaning that the alleged tortious conduct is identifiable and distinct from the primary breach of contract claim. *Broussard v. Meineke Discount Muffler Shops, Inc.* 155 F.3d 331, 346 (4th Cir. 1998).

Here, the relationship and duties between the McAlpine Parties and Princeton are matters of contract law, not of tort. These allegations of negligence are based on an alleged duty to provide clean and marketable title to the Barrington Oaks property. These allegations are mirrored in the breach of contract claim. Furthermore, the McAlpine Parties have not presented sufficient evidence of an independent tort by Princeton. Therefore, Princeton is entitled to summary judgment.

**B. The McAlpine Parties' Second Claim for Relief (Breach of Contract) –Princeton's Motion for Summary Judgment should be granted.**

Princeton is entitled to summary judgment on the McAlpine Parties' breach of contract claim as to the Princeton Contract.  As discussed above, summary judgment on a breach of contract claim is appropriate "where an agreement is clear and ambiguous and no genuine issue of material fact exists." *Epes v. B.E. Waterhouse, LLC*, 728 S.E.2d 390, 393 (N.C. Ct. App. 2012).  To prove its breach of contract claim, Princeton must show "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000).

Under North Carolina law, if one party commits a material breach of contract, the other party is excused from performance.  *Millis Constr. Co v. Fairfile Sapphire Valley, Inc.* 86 N.C. App. 506, 510, 358 S.E.2d 566, 569 (1987).  The Princeton Contract authorized termination without any payment to the McAlpine parties if ten lots were not sold by July 2010.  Princeton Contract 9, AP #3163, ECF No. 55-2.  No sales occurred.  This was a material breach of the Agreement, which excused further performance by Princeton and authorized termination of the Agreement.

The McAlpine Parties argue that it was Princeton who breached the Princeton Contract, in eight ways: it 1) failed to obtain clear title, 2) failed to disclose the existence of the lis pendens, 3) failed to take judicial action in a timely fashion to remove the cloud of title, 4) used the lis pendens as leverage to avoid marketing fees, 5) began negotiating directly with builders in violation of the covenant of good faith dealing, 6) attempted to sell lots despite McAlpine's exclusive right to sell them, 7) conspired with Eastwood to obtain the lots without paying for the developmental costs or the marketing fees, and 8) breached a fiduciary duty to the plaintiffs

created by the duties defined in the contract.  Civil Summons and Am. Compl, AP #3163, ECF

Doc. 7-6.  McAlpine has not identified sufficient facts that would support a claim of breach of

contract under any of these theories.

**1.   The Princeton Contract did not obligate Princeton to obtain clear title.**

The McAlpine Parties' first allegation fails because the Princeton Contract did not

impose a duty on Princeton to obtain clear title to the Barrington Oaks Property.   Under the

Contract, Princeton was designated as "New Lender" because it had acquired the Note from

Carolina Bank, which Note was in default.  Section 1 of the Agreement reads, in its entirety:

> Foreclosure of Property. To facilitate New Lender acquiring clear
> title to the property free and clear of liens, New Lender will conduct
> a foreclosure sale of the new Loan. Barrington, McAlpine
> Companies, and McAlpine will consent to the foreclosure and waive
> all hearing requirements and statutory notice periods.

Princeton Contract 1, AP #3163, ECF No. 55-2.  This Contract does not require Princeton to

warrant title.  While it was certainly the goal of the parties that the Property be free and clear of

liens, the only title related contractual duty on Princeton was to conduct a foreclosure sale.  The

legal effect of the foreclosure sale is not a matter over which Princeton had control, and

Princeton was not bound to do all that may have been required to make the Property free and

clear of all liens and encumbrances.

**2.   Princeton did not know of the lis pendens until February 2010.**

The McAlpine Parties' second allegation, that Princeton failed to disclose the existence

of the lis pendens, fails because Princeton did not know of the existence of the lis pendens until

February 2010.  Aff of Andrew Dreyfuss, Para. 7, AP #3163, ECF Doc 47.  Considering the

context in which the Princeton Contract was made, the claim to which the Eastwood Notice of lis

pendens related was a claim against the McAlpine Group and McAlpine Barrington Oaks.

Princeton had no involvement of any kind with that claim. Neither Princeton nor the McAlpine Parties knew of the existence of the Eastwood Notice of Lis Pendens at the time of the execution of the Princeton Contract.

Furthermore, the Princeton Contract imposed no duty on any party with respect to the Eastwood Notice of lis pendens, and if any duty were to be deemed implied, it should be on the party against whom the equitable lien was originally sought – MBO. In fact, MBO owed a contractual duty under the Deed of Trust to keep the Property free and clear of liens that would take priority over the Deed of Trust. MBO further warranted to defend the title to the Property against the lawful claims of all persons. Exhibit H to Princeton's Mot. for Summ. J*., AP #3163, ECF Doc. 46-1. If there was a duty to clear title to the Property, that duty was on MBO, not Princeton.

### 3. The Princeton Contract did not require Princeton to take judicial action to remove the cloud of title.

The McAlpine Parties also complain that Princeton failed to take judicial action in a timely manner to remove the cloud of title. The Princeton Contract did not require Princeton to take judicial action to remove the cloud of title. There is evidence of efforts made, and consideration given by, to obtain removal of the lis pendens, including insuring over it through a different title insurance company (rejected by D.R. Horton) and seeking agreement with Eastwood for the escrow of funds (which agreement was not reached between Eastwood and MBO). Lindsey McAlpine represented to Princeton and D.R. Horton that his counsel could persuade the Mecklenburg Superior Court to cancel the notice of lis pendens, and that confidence led D.R. Horton to state that the sales should wait on that event. Ex. D to Princeton's Mot. for Summ. J., AP #3163, ECF No. 46-1. The outcome was not what McAlpine hoped or expected, but such was the result of judicial decision, not inaction by Princeton.

Princeton was only a part of the transaction as the "New Lender." It was not the developer. It had borrowed money to acquire the Note. It had expected proceeds from lot sales to fund the loan obligations that it had to service. It did not want to be in the lawsuit. When it was added as a party defendant, it promptly moved to dismiss and sought to cancel the notice of lis pendens. Moreover, cancellation of the notice of lis pendens could only occur as a matter of judicial ruling, and was not a matter of contract.

### 4. There is no evidence that Princeton used the lis pendens as leverage to avoid marketing fees.

The fourth contract breach allegation growing out of the notice of lis pendens is that Princeton used the notice of lis pendens to avoid marketing fees. This is a conclusory allegation that is without factual support. Princeton sought a title insurance solution that was rejected by D.R. Horton. It obtained a judicial cancellation of the first notice of lis pendens, only to be met with a second notice. It was the dispute between the McAlpine Parties and Eastwood that resulted in the title cloud and prevented payment of "marketing fees." With D.R. Horton not purchasing any lots and in the absence of McAlpine delivering any other offers, Princeton did what it was authorized to do under the Agreement, which was to terminate it for nonperformance.

### 5. The Princeton Contract did not prohibit Princeton from communicating with other builder/purchasers.

The fifth allegation is that Princeton's communications with other builders as potential buyers of lots at Barrington Oaks violated the Princeton Contract, however, nothing in that Contract restricted Princeton, as owner of the Property, from seeking out potential purchasers. D.R. Horton was the expected purchaser but was not the only purchaser. When D.R. Horton would not purchase, it was natural and reasonable to look for other potential purchasers. In fact,

the McAlpine Parties also communicated with other potential purchasers. Because communication with other builders was not prohibited by the Princeton Contract, it cannot support a breach of contract claim.

### 6. The Princeton Contract did not create a fiduciary relationship between Princeton and the McAlpine Parties.

The sixth allegation, that Princeton breached a fiduciary duty created by the Contract, fails because nothing in the Contract or in any of the facts creates a fiduciary relationship between Princeton and the McAlpine Parties. A fiduciary relationship does not exist in the absence of "special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests" on the other. *Branch v. High Rock Lane Realty, Inc.,* 151 N.C. App. 244, 252 (2001). North Carolina courts have long recognized that a debtor-creditor relationship is not a fiduciary relationship. *Branch Banking & Trust Co. v. Thompson*, 418 S.E.2d 694, 699 (N.C. Ct. App. 1992).

In the context of a financing party, which Princeton became when it acquired the Note, a fiduciary duty arises only when the party providing financing completely dominates and controls the affairs. *Multifamily Mortg. Trust v. Century Oaks Ltd.*, 532 S.E.2d 578, 582 (N.C. Ct. App. 2000). These are not the facts presented in this case. The Princeton Contract was drafted by the McAlpine Parties' in-house counsel, and reviewed by foreclosure counsel for Princeton. They were in equal bargaining positions. No fiduciary relationship existed, and there was no such duty breached by Princeton.

### 7. The Princeton Contract did not give McAlpine the "exclusive" right to market the land.

The seventh allegation fails because the Princeton Contract did not define McAlpine as an "exclusive" agent. Moreover, if there were an exclusivity provision, it would have ended

upon termination of the Agreement, and no sales for which "commissions" would be owed occurred prior to termination.

### 8. There is no evidence to support the claim that Princeton conspired with Eastwood to obtain the lots without paying developmental costs.

The McAlpine parties claim that Eastwood and Princeton conspired to prevent them from performing under the Princeton Contract. A conspiracy requires "proof of an agreement between two or more persons." *S.N.R. Mgmt. Corp.* 659 S.E.2d at 449. Although a conspiracy may be established by circumstantial evidence, the evidence of the agreement must be sufficient to create more than a suspicion or conjecture in order to justify submission to a jury. *Id.*

The only evidence the McAlpine Parties have to support this assertion is that Eastwood communicated with Princeton during the pendency of the Princeton Contract and Eastwood ultimately purchased the Property from Princeton, after the expiration of the Princeton Contract. The Princeton Contract did not prohibit this communication.

The evidence is undisputed that the notice of lis pendens had prevented the sale of lots, D.R. Horton was not going to purchase the property, no other builders were making offers, and the McAlpine Parties refused to speak with the one party that had the ability to address the lis pendens barrier that was preventing Princeton and the McAlpine Parties from receiving sales proceeds that both desired. The fact that in December 2010, eights month after Eastwood sued Princeton, seven months after the McAlpine Parties sued Princeton, and four months after termination of the Princeton Contract, Eastwood and Princeton reached an agreement for the sale of lots, is not evidence of a conspiracy.

**C. Third Claim for Relief (Tortious Interference with Contract) – Princeton's and Eastwood's Motions for Summary Judgment should be granted and the McAlpine Parties' Cross Motion for Summary Judgment denied.**

As discussed above, in Section I, Part D, *supra*, Princeton and Eastwood are entitled to summary judgment on the McAlpine Parties' tortious interference with contract claim.

**D. Fourth Claim for Relief (Civil Conspiracy) – Eastwood's and Princeton's Motions for Summary Judgment should be granted and McAlpine's Cross Motion for Summary Judgment denied.**

As a threshold matter, the McAlpine Parties cannot state a freestanding cause of action for civil conspiracy. It is well established that "there is not a separate civil action for civil conspiracy in North Carolina." *Dove v. Harvey*, 608 S.E.2d 798, 800 (N.C. Ct. App. 2005). Another substantive claim must be established to support the civil conspiracy claim. When the substantive claim falls, the civil conspiracy claim must also fall. *See Esposito v. Talbert & Bright, Inc.*, 641 S.E.2d 695, 698 (N.C. Ct. App. 2007).

Here, none of the McAlpine Parties' substantive claims survive summary judgment. As discussed above, in Section II, Part B (h,) *supra*, the McAlpine Parties have not presented sufficient evidence to create more than a suspicion or conjecture of a conspiracy. Here, the allegations of civil conspiracy are not worthy of a trial.

**E. Fifth Claim for Relief (Unfair and Deceptive Trade Practices) – Eastwood's and Princeton's Motions for Summary Judgment should be granted.**

The McAlpine Parties have not presented sufficient evidence to support an Unfair and Deceptive Trade Practices claim. To set out a claim for unfair and deceptive trade practices, a plaintiff must allege, "(1) defendant has committed unfair or deceptive acts or practices; (2) defendant's conduct was in commerce or affected commerce; and (3) defendant's conduct caused

injury to plaintiff." *In re Ross*, 478 B.R. 715, 731 (Bankr. W.D.N.C. 2012) (*citing Norman v. Nash Johnson & Sons' Farms, Inc.*, 537 S.E.2d 248, 266 (N.C. Ct. App. 2000)). "Whether an act is an unfair or deceptive practice is a question of law for the court" *Id.* (*citing Songwooyarn Trading Co., Ltd. v. Sox Eleven, Inc.,* 714 S.E.2d 162, 167 (N.C. Ct. App. 2011)).

It is well settled that a breach of contract does not give rise to an unfair or deceptive trade practice claim; a mere breach of contract is not a violation. *See Poor v. Hill*, 530 S.E.2d 838, 844 (N.C. Ct. App. 2000); *Norman Owen Trucking v. Morkoski*, 506 S.E.2d 267, 273 (N.C. Ct. App. 1998). The breach must be characterized by egregious or aggravating circumstances. *Poor*, 138 N.C. at 844.

Once again, the case of *SNR Mgmt. Com.* is instructive. 659 S.E. 2d 442 (N.C. Ct. App. 2008). Therein, the North Carolina Court of Appeals affirmed the trial court's dismissal of an unfair trade practice claim. *Id.* at 605. The Court of Appeals explained that the landowner and third party buyer were in a business relationship with the original purchaser, there was no conduct which amounted to inequitable assertion of power over the original purchaser, and although the landowner and third party buyer used information obtained from the original purchaser and the third party buyer ultimately ended up with real property to the detriment of the original purchaser, such was not so egregious as to constitute immoral, unethical or oppressive behavior. *Id.* at 608.

The facts of this case are very similar and thus, the same result should apply.

**F. Princeton's First Counterclaim (Promissory Note) - Princeton's Motion for Summary Judgment should be granted and MBO's Motion for Summary Judgment denied.**

Princeton is entitled to recover the balance of the promissory note from MBO. The counterclaims of Princeton are based on a negotiable promissory note of MBO and a guaranty agreement of Lindsey McAlpine. Exs. A and C., AP #3163, ECF No. 47. The original Note was executed January 11, 2008 with Carolina Bank in the amount of $1,960,607.00. *Id.* The Note was assigned to Princeton pursuant to an Assignment of Mortgage of Deed of Trust and Loan on Sept. 30, 2009. Ex. B, AP #3163, ECF No. 47.

As of Aug. 15, 2012, after application of net proceeds from the foreclosure sale, the alleged outstanding balance on the loan owed to Princeton by MBO was $362,125.87 in principal, plus $72,986.40 in interest, totaling $435,112.27. Ex. I, AP #3163, ECF No. 47. MBO argues that no money is owed under the note postulating that Princeton will more than recover the amount of the Note in the future as lots are sold. MBO also notes that Princeton's profit would be approx. $350,000 more than what the profit was going to be if the McAlpine Parties' had remained in the project.

Under N.C. Gen. Stat. §45–21.36, a debtor is entitled an offset against a deficiency judgment in certain cases when the creditor purchases the property at foreclosure with a bid that is substantially less than the true value of the property. Thus, the issue is whether the amount for which Princeton purchased the Property at the foreclosure sale was worth substantially less than its value. In applying this statute, the North Carolina Court of Appeals held in *Carolina Bank v. Chatam Station*, that the amount to be used to determine whether a deficiency existed under the mortgage is the amount for which a bank purchased property the property at a foreclosure sale. 651 S.E.2d 386, 389 (N.C. Ct. App. 2007).

Here, MBO has presented no evidence that the Property is worth more than it sold for. Therefore, the only offset or credit MBO gets on the outstanding balance of the Note is the application of the net proceeds from the sale of the Property to Eastwood.

Furthermore, MBO's argument that Princeton's future profit should offset the deficiency is untenable.  In the same case above, the North Carolina Court of Appeals also stated, "The amount of the subsequent sale by plaintiff to a third party is irrelevant." *Id.*

Apart from being irrelevant, any future profit Princeton may make on the future sale of lots is also speculative. Such potential profit will be based on matters not knowable at the present, including the state of the residential real estate market, conditions of the local economy, interest rates, and development activity to be taken in the future by Princeton.

It is undisputed that Princeton Partners is the holder of the Note, that the Note is in default, that the foreclosure sale yielded less than the amount of the Note, and that Princeton is entitled to a deficiency judgment against MBO. Thus, Princeton is entitled to the remaining balance on the note, $362,125.87, accrued interest as of August 22, 2012, $72,986.40, and interest thereafter at the rate of 7.5% per annum until the date of judgment.

### G. Princeton's Second Counterclaim (Guaranty) –Princeton's Motion for Summary Judgment should be partially granted and McAlpine's Motion for Summary Judgment partially granted.

Princeton is entitled to recover from Lindsey McAlpine under the Guaranty, but those payments are limited to $25,000, per the Princeton Contract. Paragraph 2 of the Princeton Contract reads:

> Lindsey McAlpine shall continue to be bound on the Commercial Guaranty executed on January 11, 2009 for an agreed amount of $25,000 (the "Guarantee Claim"), subject to credits upon achievement of certain milestones as discussed below.   No

interest shall be charged on the New Loan with respect to the deficiency from the date of this Memorandum. Lindsey McAlpine will be given the opportunity to "work off" the Guarantee Claim by assisting in the sale of the property. . . . The Guaranty Claim shall survive the termination of this Agreement unless satisfied pursuant to the terms of Paragraph Five. . . .

Princeton Contract 2, AP #3163, ECF No. 55-2.

Because the Contract explicitly caps the guarantee and also provides that it shall survive the termination of the agreement, Lindsey McAlpine currently owes Princeton the amount of the deficiency, but only up to $25,000.

**SO ORDERED**

**This Order has been signed electronically.**    **United States Bankruptcy Court**
**The judge's signature and court's seal**
**appear at the top of the Order.**